# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-20014-01-JAR** |
| | ) | |
| **CHRISTOPHER A. PRYOR,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through undersigned counsel, responds in opposition to the defendant's Motion to Suppress Evidence, filed on April 17, 2015. (Doc.64.)  The defendant specifically seek suppression of evidence seized by law enforcement from an encounter with the defendant, which occurred on July 19, 2016, asserting that the defendant's Fourth Amendment rights were violated.  The Government maintains that all evidence was lawfully seized.

## STATEMENT OF FACTS[1]

On December 20, 2014, at approximately 1:58 p.m., Olathe, Kansas Police Officer Nicholas Stein was on routine patrol when he observed the driver of a grey Toyota Corolla fail to utilize his left turn signal when turning north onto Pine Street from West Loula Street.  Officer Stein proceeded to get behind the vehicle, and the Toyota quickly turned north onto Iowa Street, and then made an immediate right onto the alley and parked in a

---

[1] The defendant has failed to reference all relevant and material facts in his motion to suppress.  The substance of the defendant's facts seems to paint a picture of a calm and uneventful law enforcement encounter.  The failure to state the entirety of the facts has materially misrepresented the sequence of events, and given false implications that the officer somehow acted improperly.

driveway behind the residence at 518 W. Santa Fe Street.   It was fairly apparent to Officer Stein that the driver was taking actions to avoid the traffic stop, by quickly ducking into the alleyway, and then the driveway.[2]

As Officer Stein entered the alley, he noticed that Pryor had already exited his vehicle, and shut the driver's door.   Officer Stein quickly exited his marked patrol vehicle asking for backup to respond.   Officer Stein told Pryor to stop, because he needed to speak with Pryor.   Officer Stein informed Pryor that he had committed a traffic violation, and Pryor immediately became argumentative with Officer Stein.   Officer Stein's training had been to have contacted individuals remain in a vehicle in order to control the situation.   Officer Stein became concerned with Pryor's demeanor and attitude, and for officer safety, Officer Stein directed Pryor to get back into his vehicle.   Pryor reluctantly opened the driver's side door and sat down in the car.   Officer Stein, who was a canine officer with more than 9 years of experience, was standing outside the vehicle's open driver's side door, and immediately noticed the strong odor of raw marijuana coming from inside the vehicle.

Pryor began reaching for his cell phone and Officer Stein asked him not to reach for anything, and Pryor became belligerent towards Officer Stein, and refused to obey Officer Stein's directive.   The situation quickly escalated with Pryor's demeanor becoming very confrontational and abusive towards Officer Stein, and Pryor being fully resistant to Officer Stein's requests.   Officer Stein then asked Pryor to put his hands on the steering wheel, and Pryor refused to comply.   Officer Stein then noticed a silver

---

[2]During a subsequent post-*Miranda* statement, Pryor admitted that he turned into the alley in an attempt to avoid/evade the officer.   Pryor acknowledged that he did not know the owner of the residence where he parked, and fully admitted knowing the firearm was in the vehicle.

handgun in plain view in the driver's door storage compartment.   Officer Stein then grabbed Pryor's hands in order to physically place them on the steering wheel, at which time Pryor resisted Officer Stein's attempts to restrain Pryor's hands.   Officer Stein was able to utilize his police radio to alert other officers that he was involved in a situation involving an uncooperative individual with a firearm in his vehicle in the alleyway.

Officer Stein then commented to Pryor that he knew that there was a gun in the door of the vehicle, and he told Pryor he needed to secure his hands behind his back. Officer Stein was concerned if he backed away from his position that it would give Pryor open and free access to the firearm.   Pryor became more verbally abusive towards Officer Stein, and more physically resistive.   Officer Stein became more concerned for his safety due to the presence of the firearm.   Officer Stein was concerned that Pryor might use the firearm.   Officer Stein gave several verbal instructions telling Pryor to place his hands behind his back, but he would not comply.   Pryor was able to pull one of his hands free and mentioned wanting to get his cell phone in order to call his girlfriend; however, Officer Stein told him he could not allow him to move freely because of the close proximity and presence of the firearm, and because Pryor was not complying with his directions.

Officer Stein was eventually able to secure both of Pryor's hands behind his back with his hands; however, Pryor was still not cooperative and attempted to move from Officer Stein's grasp.   Officer Stein used his left leg to pin Pryor to the driver's seat, and then called for other officers to respond to assist in securing Pryor.   Several other backup officers arrived, one of whom was able to retrieve the handgun from the driver's door, while officers handcuffed Pryor.   Pryor was searched and then secured in the back of a

patrol car.

The firearm was determined to be a loaded .380 caliber Cobra pistol, serial number FS013517.   During a further search of Pryor's vehicle, Officer Stein located a recovered a broken marijuana joint on the floor in front of the driver's seat, two marijuana roaches from the area beneath the radio, and two pill bottles with marijuana residue from the center console area.

It was later determined that Pryor was driving with a suspended license, an arrestable offense.   Pryor was taken to the Johnson County jail, where Officer Stein interviewed him after advising him of his *Miranda* rights.   Pryor admitted to having handled the firearm over the past few days; however, he claimed the firearm belonged to his girlfriend,   Pryor also admitted to smoking marijuana, and methamphetamine recently.,   Pryor spoke to another detective and admitted having sold large quantities of methamphetamine and marijuana.

## ARGUMENTS AND AUTHORITIES

The defendant asserts Officer Stein's seizure of Pryor was unconstitutional, and attempts to argue that it was somehow improper for Officer Stein to direct the defendant to get back into his vehicle.   The defendant has failed to cite to contrary case law.

### I.  Officer Stein stop of Pryor was lawful from the inception.

The Fourth Amendment protects the public from "unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable "investigatory stop[s]" or detentions, *United States v. Simpson,* 609 F.3d 1140, 1146 (10th Cir. 2010).   "Because a routine traffic stop is 'more analogous to an investigative detention than a custodial arrest,' the principles set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968), guide this Court's determination as to the reasonableness of a traffic stop." *United States v. Kitchell,* 653 F.3d 1206, 1216 (10th Cir. 2011); *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).

"A traffic stop, however brief, constitutes a seizure within the meaning of the Fourth Amendment, and is therefore only constitutional if it is 'reasonable.'" *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), *cert. denied*, 535 U.S. 1072 (2002). "Borrowing from *Terry*, therefore, a traffic stop is reasonable only if two requirements are met. The court looks first at whether "'the officer's action was justified at its inception,'" and second, if "'it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Botero-Ospina*, 71 F.3d at 786 (quoting *Terry*, 392 U.S. at 20).

The first inquiry – determining whether the officer's action was justified at its inception – is straightforward. To justify the initial action – ordinarily, the stopping of the vehicle – the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* This generally means that an officer must have a lawful basis to stop the vehicle in the first place, such as an observed traffic violation. A traffic stop may be based on probable cause *or* reasonable suspicion. "[T]he Government need not show a violation actually occurred to justify an initial traffic stop. An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998); *see also Callarman*, 273 F.3d at 1287 ("While either probable cause or reasonable suspicion is

sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary."). In determining whether the officer's action was constitutionally justified at its inception, the "sole inquiry is whether [the] particular officer had reasonable suspicion that [the] particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Botero-Ospina*, 71 F.3d at 787 (quoting *Prouse*, 440 U.S. at 661).

"Reasonable suspicion is 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Callarman*, 273 F.3d at 1286 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (explaining that the "level of suspicion" required is "considerably less than proof of wrongdoing by a preponderance of the evidence"). The existence of reasonable suspicion of illegal activity is determined from the totality of the circumstances. *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

Because the temporary stop of an automobile is considered a seizure of "persons," it must be "reasonable." *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996). The stop is "reasonable" if the law enforcement officer has "probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 807 (citations omitted).

In *Botero-Ospina*, 71 F.3d at 787, the court set forth the standards for evaluating the validity of a traffic stop:

> "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to

6

the general practice of the police department or the particular officer making the stop.' *Ferguson*, 8 F.3d at 391.   It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle.   Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."

(footnote omitted).   *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

The defendant does not dispute nor challenge that Officer Stein was justified from the inception of stopping the vehicle for the traffic violation.   The officer conducted a traffic stop because there was probable cause that a traffic violation had occurred.   Thus, this traffic stop was lawful from the inception.

## A.   It is lawful for a police officer to order occupants back into a vehicle.

Before Officer Stein could even activate his emergency equipment, Pryor pulled into the alley, parked, and quickly exited the vehicle.   Officer Stein asked Pryor to stop, and clearly, as with any traffic stop, this would amount to a seizure.   While Pryor stopped, when Officer Stein advised him he had committed a traffic violation, Pryor immediately became argumentative and belligerent towards the officer, which created concerns for Officer Stein.

Although fully acknowledging the stop was lawful, the defendant suggests it became unlawful and unreasonable because Officer Stein asked Pryor to get back into the vehicle.   The defendant seems to utilize *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), along with other cases, which stand for the premise that an officer can lawfully demand an individual to get out of a vehicle after a lawful traffic stop for the safety of the officer, to suggest that it is somehow improper to do the converse, i.e., for an officer to

7

direct an individual who has exited a vehicle after a lawful traffic stop to get back into a vehicle.   However, just as an officer does not violate the Fourth Amendment by having occupants exit a lawfully stopped vehicle, so can an officer direct occupants to return or remain in the vehicle.

In *United States v. Williams*, 419 F.3d 1029, 1032-34 (9th Cir. 2005), the court in so holding, in addition to citing to *Mimms* referenced *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882 (1997), as follows:

> In *Wilson*, the Supreme Court considered whether police officers can order a passenger out of a lawfully stopped vehicle under the Fourth Amendment, balancing the passenger's liberty interest with the public interest in officer safety. 519 U.S. at 413–14, 117 S.Ct. 882. The *Wilson* Court recognized that the passenger's liberty interests are stronger than the interests of the driver because, although there is probable cause to stop the driver based on the traffic infraction, "there is no such reason to stop or detain the passengers." Id. at 413, 117 S.Ct. 882. However, the Court reasoned that the additional intrusion was minimal because: "as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle," and thus, "[t]he only change in [the passengers'] circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car." Id. at 413–14, 117 S.Ct. 882.

> The Court held, however, that the strong public interest in officer safety outweighed the minimal intrusion on a passenger's personal liberty interest. *Id.* at 413–15, 117 S.Ct. 882. Drawing primarily on the logic of *Mimms*, the *Wilson* Court emphasized the important public interest in maintaining officer safety, specifically quoting statistics of assaults and homicides on officers while enforcing traffic laws. Id. at 413, 117 S.Ct. 882; *see also Mimms*, 434 U.S. at 110, 98 S.Ct. 330 ("[I]t [is] too plain for argument that [public concern for]. . .the safety of the officer [ ] is both legitimate and weighty.").

> Those circuits to address the issue post-*Wilson* have agreed that officers may detain passengers during a traffic stop, whether it is by ordering the passenger to remain inside the automobile or by ordering the passenger to get back into an automobile that he or she voluntarily exited. *See, e.g., Rogala v. District of Columbia*, 161 F.3d 44, 53 (D.C.Cir.1998) (holding that a passenger ordered by police to get back into the vehicle that she voluntarily exited was not an unreasonable seizure because "a police

officer has the power to reasonably control the situation by requiring a passenger to remain in a vehicle during a traffic stop") (emphasis in original); *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir.1997) (passenger who attempted to voluntarily exit a lawfully stopped vehicle was not unreasonably seized when the officer ordered him to get back into the automobile and keep his hands in the air).   (citation omitted)

We agree with our sister circuits. The intrusion here is minimal and the rationale of the Court in *Wilson* and *Mimms* is instructive.  As the *Wilson* Court noted, there is little infringement on the passenger's liberty in ordering him or her out of the car because only the passenger's location during the stop is affected. 519 U.S. at 414, 117 S.Ct. 882; *see also Mimms*, 434 U.S. at 111, 98 S.Ct. 330 (holding that the intrusion on the driver's liberty is minimal where "the only question is whether [the driver] shall spend that period sitting in the. . .car or standing alongside it").  We think the difference in ordering the passenger back inside the car is immaterial.

When Williams attempted to exit the vehicle, the automobile had already been lawfully stopped with him inside. The officer's order to get back into the automobile merely maintained the status quo by returning the passenger to his original position as an occupant inside the car.   Just as in *Wilson* and *Mimms*, little is changed upon compliance with the officer's order except the position of the passenger. At most, such an order to re-enter a car that the passenger voluntarily entered, and just exited, cannot be characterized by anything but a "mere inconvenience," *Terry*, 392 U.S. at 17, 88 S.Ct. 1868, that we think falls far short of a "serious intrusion upon the sanctity of the person," or even a "petty indignity."   *Mimms*, 434 U.S. at 111, 98 S.Ct. 330; *see also Moorefield*, 111 F.3d at 13 ("imposition of having to remain in the car with raised hands" was "minimal").

Furthermore, the public concern for officer safety here is as weighty as it was in *Wilson*. We have no reason to believe, nor has has Williams provided any evidence to the contrary, that traffic stops today present safer encounters for police officers than they did less than ten years ago when *Wilson* was decided.  We are convinced that in this case the continuing importance of, and the public interest in, promoting officer safety outweighs the marginal intrusion on personal liberty. *Rogala*, 161 F.3d at 53; *Moorefield*, 111 F.3d at 13; *see also Mimms*, 434 U.S. at 111, 98 S.Ct. 330 ("What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.").

Williams argues that where a significant portion of the danger inheres in the fact that occupants can "make unobserved movements" inside the vehicle, *Mimms*, 434 U.S. at 110, 98 S.Ct. 330, and that weapons may be concealed and available within the interior of the passenger

compartment, *Wilson*, 519 U.S. at 414, 117 S.Ct. 882, ordering a passenger back into the vehicle makes little sense from the standpoint of officer safety. *See, e.g., Wilson v. State*, 734 So.2d 1107, 1111 (Fla.Ct.App.1999), *review denied*, 749 So.2d 504 (Fla.1999), *cert. denied*, 529 U.S. 1124, 120 S.Ct. 1996, 146 L.Ed.2d 820 (2000) (risk of "passenger access to weapons potentially concealed inside a car [ ] would be increased if passengers were forced back inside the vehicle") (emphasis in original).

That argument, however, fixates on only one rationale for the rule announced in *Wilson*, and ignores a substantial portion of the Court's full reasoning. Concluding that an officer may order a passenger out of the car, the *Wilson* Court enunciated two specific rationales why the rule was justified by the concern for officer safety. First, the Court explained that "[o]utside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment." *Wilson*, 519 U.S. at 414, 117 S.Ct. 882; *see also Mimms*, 434 U.S. at 110, 98 S.Ct. 330 ("a face-to-face confrontation diminishes the possibility [ ] that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault"). Second, noting the usefulness of its prior reasoning in holding that "officers had the authority to require [an occupant of a home] to re-enter the house and to remain there while [police] conducted their search" pursuant to a warrant, the *Wilson* Court recognized the value of giving officers control over the movements of people involved in a traffic stop as helpful in limiting the risk of danger to the police and the occupants of the car. *Wilson*, 519 U.S. at 414, 117 S.Ct. 882 (explaining that even where "no special danger to the police is suggested by the evidence in th[e] record" certain situations are sufficiently volatile such that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation") (*quoting Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)).

That second rationale is particularly applicable here. Giving officers the authority to control all movement in a traffic encounter is sensibly consistent with the public interest in protecting their safety. *Wilson*, 519 U.S. at 414, 117 S.Ct. 882; *Rogala*, 161 F.3d at 53 ("[I]t follows from *Maryland v. Wilson* that a police officer has the power to reasonably control the situation by requiring a passenger to remain in a vehicle during a traffic stop [.]") (emphasis in original). Allowing a passenger, or passengers, to wander freely about while a lone officer conducts a traffic stop presents a dangerous situation by splitting the officer's attention between two or more individuals, and enabling the driver and/or the passenger(s) to take advantage of a distracted officer. *Cf. Ruvalcaba v. Los Angeles*, 64 F.3d 1323, 1327 (9th Cir.1995) (noting that "it may be more dangerous to have the driver outside the vehicle while one or more other passengers are left

inside ... making it difficult, if not impossible, for the officer to keep a close watch on these passengers").   Balancing the competing interests does not require us to ignore real dangers to officers, especially in light of the minimal intrusion. Mimms, 434 U.S. at 111, 98 S.Ct. 330.

In the final calculus, we think it best left to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers. We hold that under the Fourth Amendment it is reasonable for an officer to order a passenger back into an automobile that he voluntarily exited because the concerns for officer safety originally announced in Wilson, and specifically the need for officers to exercise control over individuals encountered during a traffic stop, outweigh the marginal intrusion on the passenger's liberty interest.

See also People v. Vibanco, 151 Cal.App.4th 1 (2207); Commonwealth v. Pratt, 930 A.2d 561 (2007).

While Pryor was the only occupant of the vehicle, Officer Stein immediately had concerns when Pryor became confrontational and belligerent towards him.   Officer Stein was in an alleyway without backup officers on hand, and felt the need to quickly gain control of Pryor, who was becoming increasingly out of control, and attempt to deescalate an increasingly volatile situation.   The most plausible action he felt was available was to request Pryor to simply return to his vehicle.   Most likely Officer Stein would have asked for documents like registration and proof of insurance, which would have required Pryor to access those items inside of the vehicle.   Regardless, asking him to reenter the lawfully stopped vehicle that he had just voluntarily exited, so that Officer Stein could complete his stop, was nothing more than a "mere inconvenience."   Thus, under a police officer's authority to exercise reasonable superintendence over a vehicle and its occupants during a lawful traffic stop, an officer may order a driver and any passengers out of the vehicle without any particularized suspicion, or may order any and all occupants to return/remain in the vehicle.

11

**B.   Officer Stein's plain view observations justified any subsequent search of the vehicle.**

The defendant also suggests that there was somehow an unlawful search of the vehicle, because the incident initially involved a traffic violation.   This was not a search incident to an arrest for a traffic violation under *Arizona v. Gant*, 556 U.S. 332 (2009), to search for evidence of the failure to signal, as suggested by the defendant.   Once Pryor got back into his vehicle, Officer Stein immediately detected the odor of raw marijuana. Officer Stein was in a lawful position of making this observation, and was in this same position when he also observed the firearm protruding from the compartment in the driver's door.

An officer's detection of the smell of drugs in a vehicle is entitled to substantial weight in the probable cause analysis.   *United States v. West,* 219 F.3d 1171, 1178 (10th Cir. 2000).   The Tenth Circuit "has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage."   *United States v. Morin,* 949 F.2d 297, 300 (10th Cir. 1991) (citing cases); *United States v. Bowman*, 487 F.2d 1229, 1231 (10th Cir. 1973); *United States v. Nielsen*, 9 F.3d 1487, 1490 (10th Cir. 1993); *see also United States v. Parker*, 72 F.3d 1444, 1450-51 (10th Cir. 1995) (smell of marijuana provides probable cause to search the passenger compartment of a vehicle); *see also United States v. Vasquez-Castillo,* 258 F.3d 1207, 1212-13 (10th Cir. 2001) (holding that the smell of marijuana and irregularities in the trailer and log books of commercial truck created probable cause); *United States v. Ozbirn,* 189 F.3d 1194, 1200 (10th Cir. 1999) (holding that officer's detection of the smell of marijuana was sufficient grounds upon which to

detain suspect).   *See also United States v. Nichols,* 374 F.3d 959, 964 (10th Cir. (Kan.) 2004)[3]; *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. (Kan.) 2003); *United States v. Downs,* 151 F.3d 1301, 1303 (10th Cir. 1998); *United States v. Nielson*, 9 F.3d 1487, 1489-90 (10th Cir. 1993).

Once probable cause exists for a search, the police have authority to search the entire vehicle.   *United States v. Loucks*, 806 F.2d 208, 209 (10th Cir. 1986).   Officer Stein was a trained narcotics officer and detected the odor of raw marijuana coming from inside the vehicle, thus he would have been justified to search any occupants and containers inside the vehicle for suspected marijuana.   In fact, during his subsequent search of the vehicle, Officer Stein recovered both raw and smoked marijuana from the vehicle.   It was quickly after the observation about the marijuana that Officer Stein then observed the firearm in the driver's door – within arms' reach of an increasingly belligerent and noncompliant Pryor.

Officer Stein's plain view observations quickly developed into probable cause, thus there was no need for a search warrant.   *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (stating that "if police are lawfully in a position from which they view an object, if [the object's] incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, it may be seized without a warrant").

The Supreme Court has described probable cause as requiring "a substantial chance of criminal activity, not an actual showing of criminal activity," *Illinois v. Gates*, 462

---

[3] This Court found that a stop premised on several traffic violations was permissibly expanded when police smelled raw marijuana in the vehicle.

U.S. 213, 244 n.13 (1983) (emphasis added); or a "fair probability that contraband or evidence will be found," *id.* at 238 (emphasis added); and to meet these standards something less than a preponderance of the evidence is required. *See Texas v. Brown*, 460 U.S. 730, 742 (1983) (explaining that probable cause "does not demand any showing that such a belief be correct or more likely true than false"); *United States v. Patane*, 304 F.3d 1013, 1018 (10th Cir. 2002) (stating that probable cause does not require "even a preponderance of evidence of guilt"); *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) ("[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark.") (internal citations omitted)).

Vehicle searches are permissible under the "automobile exception," which authorizes a warrantless search of a vehicle if the police have probable cause to believe the vehicle contains evidence of a crime.  *See United States v. Ross*, 456 U.S. 798, 820-82 1 (1982).  If there is probable cause to believe that a vehicle contains evidence of a crime, a warrantless search of that car would be lawful under the automobile exception to the warrant requirement.  *See Maryland v. Dyson*, 527 U.S. *465,* 466-467 (1999); *Wyoming v. Houghton*, 526 U.S. 295, 300-302 (1996).  The subsequent search of the Toyota was done under the *Carroll*[4] doctrine because the officer(s) had probable cause to believe the vehicle contained contraband – the firearm and marijuana, thus there was obviously not a need for a search warrant to conduct the search.

## CONCLUSION

WHEREFORE, the Government prays for all of the foregoing reasons that this

---

[4]*Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Court deny the defendant's motion to suppress.   There was clearly no Fourth Amendment violation.

Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney


 s/ Terra D. Morehead
TERRA D. MOREHEAD
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas   66101
(913) 551-6730
Ks. S. Ct. No. 12759

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of August, 2016, I electronically filed the foregoing response with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

  s/ Terra D. Morehead
Terra D. Morehead
Assistant United States Attorney

15